DECISION AND JUDGMENT ENTRY
This is an appeal from a Hocking County Common Pleas Court, Juvenile Division, judgment that granted Hocking County Children Services (HCCS) permanent custody of Ronald Lawrence Azbell (D.O.B. 8-23-95), Donald Lee Azbell (D.O.B. 8-2-96), Harley Davidson Azbell (D.O.B. 7-31-98) and Embery Leann Walker (D.O.B. 10-31-99).[1] Rebecca Moore, their natural mother and appellant herein, assigns the following error for our review:
 "THE LOWER COURT ABUSED ITS DISCRETION WHEN IT DETERMINED THAT A GRANT OF PERMANENT CUSTODY WAS IN THE BEST INTEREST OF THE MINOR CHILDREN."
A brief summary of the facts pertinent to this appeal is as follows. On July 20, 2001, appellant, Lawrence Azbell and their four children visited a bank in Lee County, Illinois, where appellant attempted to cash a forged check.[2] Federal marshals were on hand and arrested appellant. Azbell took their four children and fled the area.
Azbell surfaced seven days later in South Bloomingville, Ohio, and left the children off on his mother, Hazel Azbell. Mr. Azbell gave his mother their birth certificates and social security cards and told her that if he did not return, she could "keep" them. Azbell left almost immediately without telling his mother where he was going or when he would return. Mrs. Azbell was ill prepared to keep the children and thus called HCCS for help.
Several caseworkers responded to Mrs. Azbell's call and brought food and diapers to help get the family through the weekend. The following Monday, however, Mrs. Azbell again phoned HCCS to tell them that she was simply unable to care for the children. HCCS obtained emergency protective orders and took temporary custody of the children.
The action below was commenced on July 31, 2001 when HCCS filed a complaint and alleged that the children were dependent, as defined in R.C. 2151.04(C), and asked for permanent custody. Along with its complaint, HCCS also submitted a detailed factual memorandum outlining an extensive investigation into the family background. That investigation revealed evidence of a transient, criminal, lifestyle in several states, as well as protective services cases opened for the children in New York and Missouri. HCCS also alleged that appellant was in jail facing multiple charges in Illinois, not to mention federal charges elsewhere, and that Mr. Azbell was incarcerated in Missouri for rape.
The trial court appointed guardian ad litem (GAL) filed a detailed report and opined that the children were dependent and neglected, and that permanent custody would be in their best interests. In support of that recommendation, the GAL described the chaotic lives the family led over the years, the open case files by family services agencies in two separate Missouri counties, how both appellant and Azbell had lost custody of other children in the past, how neither of them gave these children proper care and parenting or were able to stop their "criminal behavior" and protect them. On this latter point, the GAL described the effect of the family's lifestyle on the children as follows:
"The four children involved in the pending matter have been on the run with their parents and have been subjected to their parent's unstable lifestyle. They have been known to live in a car at times. The children have been present when the parents stole mail from mailboxes and have also been present when their parents have been arrested. It was reported that the children were not allowed to have any social contact with anyone outside their immediate family and the foster parents have stated that the children are afraid to sleep alone and that the boys talk frequently about policemen and guns and they have said that you have to be quiet when anyone comes to the door. It was also reported that [Mr. Azbell] kept a loaded shotgun under the car seat when they were `on the run' and the U.S. Marshalls considered them to be armed and dangerous. The children have been in and out of foster care for the last two years. None of the children have had their immunizations kept up to date. Their health has been neglected. The children's parents have repeatedly shown that they have failed to provide for the children's basic needs."
The matter came on for an adjudicatory hearing in December, 2001. Appellant and Azbell apparently admitted to the allegations contained in the complaint.[3] The trial court found the children to be dependent and scheduled a disposition hearing. In the meantime, Azbell filed a motion asking that his cousin, Daniel Azbell, and his cousin's wife, Candy Azbell, be granted physical and legal custody of the four children. The trial court ordered a home study be prepared.
A disposition hearing was held over several days in January and February of 2002. Because appellant and Azbell were both incarcerated outside of Ohio, neither of them were present at this proceeding, although appellant did testify by telephone. Mrs. Azbell testified that she rarely saw her son because he had been in and out of prison most of his life. The witness recounted that her son had fathered at least eleven children and that she raised and later adopted one of them (Timothy). Nevertheless, Mrs. Azbell was unable to care for these grandchildren. She noted that when her son left the children at her house, they had only a few toys and wore "scrubby clothes."[4]
Leesa George, HCCS intake supervisor, testified that the children had previously been in foster care in New York and Missouri, and that appellant had another child placed for adoption in 1990 because she was "living place to place." Sally Lanning, another HCCS supervisor, testified that when the agency first came in contact with the children they had various medical and developmental problems. Ronald and Donald both needed extensive dental work because of decayed baby teeth, and both boys experienced learning and/or speech problems in school. Donald also had trouble walking, although the precise cause of the problem was unclear. The evidence revealed that these children lived in at least five different states during their short lives (Alabama, New York, Missouri, Tennessee and Florida) which made scattered medical records almost impossible to retrieve. Further, HCCS still could not collect any definitive records concerning their childhood immunizations.
Neither parent really challenged any of this evidence but, instead, focused their attention on the childrens placement with Mr. Azbell's cousin, rather than permanent custody to HCCS. Although Daniel and Candy Azbell had never met these children, both testified that they wanted to have custody and even adopt them. Lanning objected, however, to placing the children with the Azbells. While there was no apparent problem with the couple's home study (Daniel had steady employment, they both ran a daycare business from their home and are seemingly competent caregivers), Lanning expressed concern about placing the children with any relative. She explained those concerns as follows:
"My concern about Dan and Candy is several things really. And I just had the one conversation that day with them — I didn't do the home study — is that with the knowledge and by me reading more into his record and in talking with the various family members, there's been no consistent contact with the family by Lawrence or Rebecca with either of their families. Rebecca has stated to me that she wants the kids back. She's also stated to me that if Lawrence is released prior to her that she believes Lawrence will go get the kids and she'll never see them again. Rebecca has also stated to me that Lawrence is violent and that her concern was that he would just take them here to her to here, you know, and move around with them.
"With that, with her statements and in reviewing his legal record, my concern is not only the safety of the children, but really safety of the relatives. This is a pretty extensive family from what I know of and the family members I've talked to have all been very forthcoming with the fact that if Lawrence shows up at their house, that yes, he probably could get the kids away from them and concerns that they, themselves, would be put into a situation that they would be harmed or their own families would be harmed and I think that's a real scary thing.
"* * *
"I guess that's my concern with relatives is that I do believe despite a court order giving any relative custody, that I do believe that Donald — I'm sorry, Lawrence would try to take the kids from the relatives and that these two will know where the kids are if they're with relatives. There is no doubt about that. And I believe the relatives would give in to him."
Daniel and Candy Azbell tried to alleviate these concerns by their promise to keep the children from their father. They further related that, if Mr. Azbell did indeed show up at their house, they would lock the doors and call "911." Candy Azbell, in particular, related that she was not concerned about their safety as there were several "police that live in the area."
The matter was taken under advisement and, on February 13, 2002, the juvenile court filed a detailed, twelve page decision and judgment entry that granted permanent custody to HCCS. In so doing, the court found that both parents demonstrated a lack of commitment toward the children by failing to provide regular support or an adequate home. Supporting one's family through criminal means, the court aptly observed, was not "adequate." Further, Mr. Azbell was incarcerated for a period of sixteen (16) months as of September 16, 2002, and appellant was incarcerated for a period of twenty-four (24) months as of that date. These factors, together with their past transient lifestyle and its detrimental effect on the childrens' health and stability, led the court to conclude that the children could not, and should not, be placed with either parent and that a grant of permanent custody to HCCS was in their best interests.
As for Daniel and Candy Azbell, the court noted that state law did not require consideration of placement with a relative unless the children were orphaned.[5] In any event, the court found that Daniel and Candy had never met the children, that there was no relationship between them and that there was too great a risk that the natural parents would try to interject themselves or otherwise interfere with the childrens' lives if they were placed with relatives. The court noted that any such interruption would be detrimental to their need for permanence and stability and would not be in their best interest. Thus, the court rejected Daniel and Candy Azbell as a potential placement. This appeal followed.
Appellant argues in her assignment of error that the trial court erred in determining that a grant of permanent custody to HCCS was in her childrens' best interests. In support of that argument she cites testimony from Hazel Azbell and Debra Price (Lawrence Azbell's mother and sister) characterizing her as a competent caregiver. She further cites testimony from Leesa George and Sally Lanning (of HCCS) that she asked about her children when she spoke with them and that she was interested in her children's welfare. Finally, she contends that her "only downfall in this matter was the fact of her incarceration" and that her release from prison is imminent.[6] She concludes that her parenting skills "cannot be faulted" and that her criminal record is not enough to divest her of her parental rights. We are not persuaded.
To begin, we note that many factors, including appellant's current incarceration, caused concern for the trial court. Appellant's pattern of continued criminal activity and fleeing from the authorities led the court to conclude that the children could not, and should not, be returned to her custody. Moreover, despite what appellant argues in her brief, her criminal record was not her "only downfall." The record does reveal that appellant lacked sufficient parenting skills. The uncontroverted evidence in this case was that she and Azbell supported their children solely through a life of crime, led a chaotic lifestyle fleeing from state to state and failed to provide the children with a stable home and an adequate source of support. When taken into HCCS custody, the children were wearing inadequate clothing and had various dental and physical problems. HCCS could not collect their medical records, and it is still unclear what, if any, childhood immunizations these children have received. Lanning also rendered the following opinion from her dealings with appellant:
"Rebecca — if, in fact, the children would go with family, my concern with Rebecca is that — I mean I have to tell you, I've had phone conversations I've had thirty — thirty-five minimum at least phone conversations and my concern with Rebecca is she just doesn't seemto have any idea of what these kids need in the sense of their medicalneeds, their education needs. She has very much denied and minimized and I have kept her very updated on everything these kids do. I have sent her letters. I've sent her pictures. And when I talk to her, I just don'tfeel she's grasping the concepts of their needs and that for instance, the dental, three of the children have pretty extensive dental problems and two are referred to a pediatric dentist and her explanation was well, that shouldn't be because they brush their teeth every day. And that could very well be and I'm not saying they didn't. But it — she's not grasping these children had bad teeth when they were with her. I mean this just isn't — when you look at, for instance, Donnie he has black clear across the front of his mouth and that's rotted and decay." (Emphasis added.)
Appellant clearly has had problems fulfilling her role as a traditional parent and caregiver. Moreover, this is not a problem that has arisen since appellant was incarcerated or will be alleviated after her release. The record reveals that appellant lost permanent custody of another child in Fairfield County and that these children have been in protective custody in other states on prior occasions.[7]
We readily acknowledge that parents have a fundamental liberty interest in the care, custody and management of their children. Troxel v.Granville (2000), 530 U.S. 57, ___, 147 L.Ed.2d 49, 56, 120 S.Ct. 2054;Santosky v. Kramer (1982), 455 U.S. 745, 753, 71 L.Ed.2d 599,102 S.Ct. 1388. The right to raise one's child is an essential and basic civil right in this country. In re Hayes, 79 Ohio St.3d 46, 48, 1997-Ohio-178,679 N.E.2d 680; In re Murray (1990), 52 Ohio St.3d 155, 157,556 N.E.2d 1169. However, that right is not absolute. The natural rights of the parent are always subject to the ultimate welfare of the child which is the pole star or controlling principle to be observed. See In reCunningham (1979), 59 Ohio St.2d 100, 106, 391 N.E.2d 1034. Thus, the state may terminate parental rights when the child's best interest demands it. In re Dyal, Hocking App. No. 01CA12, 2001-Ohio-2542; In reDecker, Athens App. No. 00CA42, 2001-Ohio-2379.
The provisions of R.C. 2151.414(B)(1)(a) state that a court may grant permanent custody of children to a children services agency if it finds, by clear and convincing evidence, that it is in the best interest of the children for permanent custody to be granted and, inter alia, the children cannot be placed with the parents within a reasonable time or should not be placed with them. In determining what is to be in the best interests of the children, a court must consider all relevant factors, including the custodial history of the child and the child's need for a legally secure permanent placement (and whether that type of placement can be achieved without a grant of permanent custody to the agency). Id. at (D)(3)(4). The trial court in this case obviously and correctly placed great emphasis on the childrens' need for a secure and permanent placement. Further, the court took into account both the physical and developmental problems that the children have suffered as a result of their parents' failure to serve as adequate caregivers. On that basis, the court found that it was in their best interests to grant HCCS permanent custody.
When a court reviews a permanent custody award to a childrens' services agency, judgments supported by some competent and credible evidence will be affirmed. In re P.R., Cuyahoga App. No. 79609, 2002-Ohio-2029, at ¶ 15; In re Hogan, Allen App. No. 1-01-141, 2002-Ohio-1770; In reJones, Franklin App. No. 01AP-616, 2001-Ohio-8871. After a thorough review of the record in the case sub judice, we find abundant evidence to support both the trial court's factual findings as well as its ultimate determination that permanent custody to HCCS was in the best interest of these children. George and Lanning both provided ample testimony as to the deleterious effects of the parents' lifestyles on these children. Moreover, the GAL also recommended that permanent custody be granted to HCCS. The trial court ultimately agreed that such disposition was in the best interests of these children and we find no error in that determination.
Appellant's assignment of error is thus without merit and is hereby overruled. The judgment of the trial court is affirmed.
JUDGMENT AFFIRMED.
Kline, J. Evans, J.: Concur in Judgment Opinion.
[1] Embery's last name is different from her brothers' because her parents were both using aliases at the time of her birth.
[2] Lawrence Azbell is the natural father of the four children at issue. It is unclear from the record, however, whether he and appellant were married.
[3] We have no transcript of that proceeding and, thus, take this information from the court's subsequent judgment entry.
[4] When HCCS employees first came in contact with the children, Donald and Harley were wearing clothes that were too big for them, "all three boys had mens size underwear on" and Embery had "a little dress outfit on and it was too small for her."
[5] See R.C. 2151.414(B)(1).
[6] Appellant contends that she will be released from prison in May of 2003. However, the court found that she would be in prison for twenty-four months as of September 26, 2001. This would mean a release date in September of 2003 rather than May of that year. Moreover, there appears to be some uncertainty over whether appellant will face additional federal charges for a check stolen in Iowa and cashed in Illinois.
[7] Appellant had another baby while she was in prison for this offense and that child was also taken into custody by authorities.